**Electronically Filed
Intermediate Court of Appeals
CAAP-11-0000494
31-JUL-2014
08:40 AM**

NO. CAAP-11-0000494

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

STATE OF HAWAI'I, Plaintiff-Appellee, v.
WADE H. NAKAYAMA, Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE SECOND CIRCUIT
(CR. NO. 10-1-0668(4))

MEMORANDUM OPINION
(By: Leonard, Presiding Judge, Reifurth and Ginoza, JJ.)

Defendant-Appellant Wade H. Nakayama (**Nakayama**) appeals
from a Judgment of Conviction and Probation Sentence (**Judgment**)
entered by the Circuit Court of the Second Circuit (**Circuit
Court**), dated June 2, 2011.[1] After a four-day jury trial, the
Circuit Court convicted Nakayama on one count each of: (1)
Sexual Assault in the Fourth Degree, in violation of Hawaii
Revised Statutes (**HRS**) § 707-733(1)(b) (1993)[2] (**Count I**); (2)

---

[1]     The Honorable Richard T. Bissen, Jr. presided.

[2]     HRS § 707-733 provides in relevant part:

> **Sexual Assault in the fourth degree.** (1) A person
> commits the offense of sexual assault in the fourth degree
> if:
>     . . . .
>     (b) The person knowingly exposes the person's genitals
> to another person under circumstances in which the actor's
> conduct is likely to alarm the other person or put the other
> person in fear of bodily injury; . . .

Indecent Exposure, in violation of HRS § 707-734(1) (1993)[3]

(**Count II**); and (3) Unauthorized Entry into Motor Vehicle in the

Second Degree, in violation of HRS § 708-836.6 (Supp. 2013)[4]

(**Count III**).   On appeal, Nakayama argues that his conviction

should be vacated and the case should be remanded for a new trial

due to various alleged errors in jury selection and certain

evidentiary rulings.

I.   RELEVANT FACTS

On December 27, 2010, the State of Hawai'i (**State**)

filed a Complaint against Nakayama, charging him with the above-

referenced offenses, which arose from an August 18, 2010 incident

in which Nakayama allegedly made lewd and sexual comments towards

Complainant (**Complainant**) and then, reportedly, entered into the

back seat of Complainant's car (which was parked in her garage),

masturbated, and ejaculated.

A.   Exclusion of Defense Witnesses

During a pre-trial motion in limine hearing, the

defense noted that it intended to call two "[p]ositive character

---

[3]     HRS § 707-734 provides in relevant part:

> **Indecent exposure.**   (1) A person commits the offense
> of indecent exposure if, the person intentionally exposes
> the person's genitals to a person to whom the person is not
> married under circumstances in which the actor's conduct is
> likely to cause affront.

[4]     HRS § 708-836.6 provides:

> **Unauthorized entry into motor vehicle in the second
> degree.**   (1) A person commits the offense of unauthorized
> entry into a motor vehicle in the second degree if the
> person intentionally or knowingly enters into a motor
> vehicle without being invited, licensed, or otherwise
> authorized to do so.
>      (2) Unauthorized entry into a motor vehicle in the
> second degree is a misdemeanor.

witnesses," David and Judy Mikami (**the Mikamis**). Defense counsel, Hayden Aluli (**Aluli**), informed the court that the Mikamis were offered to show Nakayama's "law abidingness and honesty." At that point, the court reserved ruling on whether to permit the defense to call the Mikamis. During trial, the Circuit Court did not allow the Mikamis to testify as to Nakayama's character for being law-abiding and truthful, citing Hawaii Rules of Evidence (**HRE**) Rule 608, on the grounds that Nakayama's character for being law-abiding and truthful had not been attacked.

B. Voir Dire

1. Prospective Juror 4

The Circuit Court began jury selection with its initial voir dire of the potential jurors. It was revealed that Aluli represented one of the jurors and the juror's husband in an unrelated legal matter in July 2010, less than a year prior to the trial in the instant case. The juror, Prospective Juror 4 (**Juror 4**), advised the trial court that Aluli "did do a great service for my husband and I" and that they were appreciative of that. The court asked Juror 4, "you think you might favor Aluli more because you had a positive experience with him?" Juror 4 responded: "Probably yes. I'm going to say yes." After further questioning by the parties, the court excused Juror 4. Aluli did not immediately object to the court's act of excusing Juror 4.

2. Prospective Juror 63 and Prospective Juror 21

The court also allowed the parties to conduct their own individual voir dire of the jurors. When Aluli questioned

Prospective Juror 63 (**Juror 63**), the following exchange took place:

> [Mr. Aluli]: I know, [Juror 63], that you answered honestly that there are, you know, issues with -- or you have perhaps issues about the nature of the charges here. And I'll be more -- I'll be very clear. The evidence is going to show that an allegation is going to be made that Wade masturbated and ejaculated in the complainant's car. Okay. Now, given the nature of these allegations, [Juror 63], do you have any concerns about the nature of the charges?
>
> THE JUROR: No, not really.
>
> MR. ALULI: Not really? Okay. You mentioned it's going to be very -- impacts upon person's lives, right? What do you mean by that?
>
> THE JUROR: Well, I didn't really know that -- the exact charges, but if things that -- to me, any sexual act to someone, that hangs in your mind for your whole life.
>
> MR. ALULI: Okay. And is the nature --
>
> THE JUROR: Abuse. Any kind of abuse.
>
> MR. ALULI: And does that -- those issues and nature of these allegations cause you to perhaps want to continue sitting as a juror in this case?
>
> THE JUROR: I feel I probably can be pretty fair about, you know, hearing the information and making a decision.
>
> MR. ALULI: Okay.
>
> THE JUROR: Based on the information.
>
> MR. ALULI: When you said probably, what did you mean by probably?
>
> THE JUROR: Well, I have to hear the information and weigh it. So based on that, I could make a decision whether I feel a person's guilty.
>
> MR. ALULI: Okay. So, you know, when I heard you say probably, I guess, no doubt, the prosecution and defense want to be sure that each and every one of you are gonna be fair and unbiased and give both the Government and the defendant a fair trial. And that's one of the things that you need to bind to. Okay. And if any one of you, including [Juror 63], honestly feel that you can't give the Government and the defendant a fair trial -- and I'm talking to be honest like it's not probably can, because you're not dealing with probably, because that's not binding one's self to the principles that really inure to our democracy. Because based on probably, I probably think the Judge would be the first one to say probably is not good enough. So I guess I want to ask you again, [Juror 63], please, honestly, given the hearts of your heart and knowing who you are, can you give defendant a fair trial, ma'am?
>
> THE JUROR: I feel once I hear evidence, I can make a fair decision from what I hear.
>
> MR. ALULI: Thank you, ma'am, for your honesty. Appreciate it.

Aluli questioned Prospective Juror 21 (**Juror 21**), in relevant part, as follows:

> [Mr. Aluli:] [Juror 21], you talked about -- about having doubt and whether or not if that doubt is slight. If, after hearing all the evidence, and listening to the

Court's instructions, that will be based that if you have a doubt and it's based upon reason and common sense, would you be able to return a verdict of not guilty?
THE JUROR: I would like to say yes.

But, Juror 21 later noted that,

And then, just when you said that, about the masturbating in the car, I went back to when I was seven years old and I was -- I was walking down the street, and there's some guy at a red light masturbating in his car. And I -- and I looked over and I thought, oh, what's that. You know, I was seven years old. And I'm 54 now, and I can still remember it. So will that -- will that taint my -- my -- my decision? I don't know. You know what I mean?

Juror 21 stated:

But I wasn't -- I mean, I wasn't -- I mean, my life went on, of course, but I remember that. But I don't know if -- this is difficult. The flip side of that should -- should he have been charged with some horrendous thing? I -- I don't think so. I don't know.

Thereafter, Aluli asked Juror 21, "can you be fair, knowing the nature of the charge and knowing your hearts of hearts, to be fair to both prosecution and [Nakayama]?" Juror 21 responded: "No, I don't think so."

However, when subsequently questioned by the court, Juror 21 reconciled her answer to the court as:

Your Honor, because [defense counsel] asked -- he asked -- in our gut, can we honestly say -- knowing our background and taking into consideration our gut feelings, would we honestly be able to say we would be fair. When it's asked that way, no, I can't honestly say, but if the trial goes on and I know it happened and hear the whole story, then I could -- then I could make a decision of guilt or innocence. But right now, following letter of the law, the man is presumed to be innocent.

Later, both Juror 63 and Juror 21 assured the court and defense counsel that they would not hold it against Nakayama should he choose not to testify during trial, that they both accept the principle that Nakayama was presumed to be innocent until proven guilty, and also that the burden of establishing such guilt was on the State. The court ruled not to excuse

5

either Juror 63 or Juror 21 for cause. Subsequently, the defense used two of its peremptory challenges to excuse both Juror 63 and Juror 21.

### 3. Juror 11

During jury selection, one of the jurors, Juror 11, informed the court that he knew one of the witnesses, Damien Pires (**Pires**), and the following exchange occurred:

> [The Court:] Damien Pires, could be Pires, P-I-R-E-S, also with the Maui Electric Company, Kaunakakai. Anybody know this person?
> THE JUROR: I know him, sir.
> THE COURT: [Juror 11], all right. Is it the same way that you know Mr. Sambajon?
> THE JUROR: That's correct. However, I worked even more closely with Damien as he was in a supervisory capacity.
> THE COURT: Okay.
> THE JUROR: And I was a manager.
> THE COURT: I guess I'll ask the same question. Do you feel that because you've worked with Mr. -- is it Pires? Is the last name pronounced Pires or Pires.
> THE JUROR: Pires.
> THE COURT: Do you think you can put aside your previous work relationship and can you evaluate his testimony as you would any other witness?
> THE JUROR: I believe so, Your Honor.
> THE COURT: All right. Again, the attorneys may want to follow up and ask more questions, [Juror 11]. Thank you.

During the earlier voir dire, the court had asked the jurors if anyone knew potential witness, Jerry Sambajon:

> [THE COURT:] Jerry Sambajon or Sambajon, S-A-M-B-A-J-O-N, care of Maui Electric on Kaunakakai. Does anyone know this person?
> THE JUROR: I know him, Judge.
> THE COURT: All right. That's [Juror 11]. Can you tell us how you know Jerry Sambajon?
> THE JUROR: I'm a retired employee of Maui Electric Company.
> THE COURT: Okay.
> THE JUROR: And subsequently had contact with Jerry when I went to Molokai.
> THE COURT: Okay. How long ago, when was the last time you recall having contact?
> THE JUROR: I can't recall that, but I retired from Maui Electric about four -- four and-a-half years ago.
> THE COURT: Okay. So you haven't seen -- this Mr. -- is it Jerry? Is he a he?
> THE JUROR: I'm sorry?
> THE COURT: Is he a male, Jerry Sambajon?
> THE JUROR: That's correct.

THE COURT: So you last saw him maybe five -- more than four and-a-half years ago?
THE JUROR: That's correct.
THE COURT: All right. If Mr. Sambajon is called as a witness in this case, can you be fair and impartial to both sides? Can you put aside your previous work with Mr. Sambajon?
THE JUROR: I believe so.
THE COURT: All right. The attorneys will follow up. They'll ask more questions of you, [Juror 11]. Thank you.
Anyone else know Mr. Sambajon? Let the record reflect no response.

The trial court permitted each party twenty minutes to directly question the prospective jurors, during which time Aluli did not ask Juror 11 any questions. Ultimately, Jerry Sambajon was not called to testify during the trial.

Subsequently, as discussed below, Juror 11 was questioned again during trial, after informing the bailiff that he was aware of certain circumstances involving the Defendant's only witness.

C.   The Trial

1.   Testimony of Witnesses Generally

The trial began on March 14, 2011 and ended on March 17, 2011. The State called five witnesses in its case-in-chief: Pires; Sybil Lopez (**Lopez**); Complainant; Officer David Roarty (**Officer Roarty**); and Complainant's brother (**Brother**).

Complainant testified that at approximately 12:00 p.m. on August 18, 2010, Nakayama drove onto her driveway, exited his vehicle, and made lewd and sexual comments to her, exposed himself to her, and then entered into the back seat of her vehicle that was parked in her garage and masturbated. Further, Complainant testified that after Nakayama ejaculated, he cleaned himself and her car with a shirt or rag, apologized to her, and then left. Complainant testified that she called her friend

7

Pires, who accompanied her to the Moloka'i police station in Kaunakakai, where she made a report to Officer Roarty. She testified that she told Officer Roarty everything that Nakayama had allegedly done earlier that day. After making her report, Complainant and Pires had lunch with Brother, and Brother was informed of what Nakayama allegedly had done. Later that day, Brother brought Nakayama to the Moloka'i Youth Center, where Nakayama apologized to Complainant.

Officer Roarty testified that at about 1:02 p.m. on August 18, 2010, Complainant, who was accompanied by a male, provided a statement to him about what Nakayama had allegedly done earlier that day. However, Officer Roarty's testimony was not entirely consistent with Complainant's trial testimony. Officer Roarty testified that Complainant told him Nakayama made lewd sexual comments towards her, such as: "[y]ou make me fucking hard" and "[w]e don't need to fuck, I'll just eat you," and that Nakayama had also unzipped his pants. But, according to Officer Roarty, Complainant said that Nakayama did not expose himself to her. Further, Officer Roarty testified that Complainant did not tell him that Nakayama went into her vehicle, that he "exposed his penis," that he "stroked his penis in her presence," or that he "ejaculated in the back of her car." Officer Roarty answered in the affirmative when asked whether he would have "put it down" in the report if Complainant had relayed any of the above-referenced details to him.

Brother testified that he, Complainant, and Pires had lunch together on August 18, 2010, and that both Pires and

Brother wanted "to confront [Nakayama] to get to the bottom of" it. Brother stated that he was "angry" and "pissed off." Later that day, Brother found Nakayama and "confronted" him on the street near Nakayama's residence, and he told Nakayama that he needed to meet with him. During the later encounter with Brother, Pires showed up and was "as angry" with Nakayama as Brother was. Brother stated that he had to ask Pires to "back off" of Nakayama during that encounter. Brother took Nakayama in his van to meet with Complainant at the Moloka'i Youth Center. Brother described his role at the youth center "as like a mediator" and described that he did "act as a mediator between [Complainant] and [Nakayama]." At the youth center, Brother brought Complainant to his van where Nakayama was waiting and told Nakayama to apologize to Complainant. Brother explained: "She didn't wanna [sic] come out [of the youth center], but I told her I needed to know, you know, I -- I didn't know any other way to get closure. I wanted to squash this."

Lopez testified that she worked at the Moloka'i Youth Center, and she corroborated Brother's testimony that he "kind of mediat[ed] the situation" between Nakayama and Complainant in the youth center's parking lot. From Lopez's perspective, Brother was "mediating . . . to get [Nakayama] and [Complainant] to kind of settle this issue," which she recalls as having lasted approximately 15-30 minutes. Lopez testified that she overhead Nakayama apologize to Complainant.

Pires testified that he had accompanied Complainant when she provided her statement to Officer Roarty on August 18,

2010. Further, Pires testified that prior to accompanying Complainant to the police station, Complainant told him that Nakayama had masturbated in the back of her car, and that she told the same to Officer Roarty. Additionally, Pires testified that later that day, he went to look for Brother and found him "talking" with Nakayama. Pires stated that he exited his vehicle "to make sure [that Brother and Nakayama] didn't get into any altercation." He testified that Brother and Nakayama got into Brother's van, where Brother "drove off" so Nakayama could "apologize to [his] sister at the youth center." Pires followed.

At the youth center, Pires explained that Brother told Nakayama: "Eh, go ahead and tell my sister what you wanna say." Pires stated that Brother attempted to exclude Pires from hearing the apology by Nakayama towards Complainant and that Brother stated: "It's between us. It's us Japanese people."

Nakayama did not testify at trial, and he called only one witness, Malu Dunnam (**Dunnam**), who provided negative character testimony about Complainant and Pires. In particular, Dunnam testified that Pires "is not an honest person. . . . He doesn't have it in him to be honest and do what is right." Similarly, Dunnam testified that she did not believe Complainant to be a truthful person.

In rebuttal, the State re-called Pires, who testified that he was Dunnam's supervisor when the two worked at Maui Electric Company and that because Dunnam "failed to do what she was trained to do," an island-wide blackout in 2008 resulted. Shortly thereafter, Dunnam was terminated from Maui Electric

Company. In short, Pires was brought back to attack Dunnam's credibility.

2.    Further Voir Dire of Juror 11

During the recess in the middle of Dunnam's testimony, the court informed the parties as follows:

> My bailiff just made mention to me about juror in Seat Number 11, [Juror 11], which was a former employee of Maui Electric. In essence, he does not know the witness, but thought she looked familiar. And I guess when she described where she's worked before, that's (inaudible). He thinks he might have heard about this issue, the power outage that happened in 2008, whatever incident that was, whatever year that was, he might have some information about that. He's not sure if any issues of the Maui Electric discussion might come into play. Does anybody want to voir dire him or talk with him about this issue?

Subsequently, the court and parties agreed that the parties would complete Dunnam's testimony and then voir dire Juror 11. Immediately prior to the voir dire of Juror 11, the following exchange took place:

> THE COURT: So should we isolate [Juror 11] and ask him questions?
> MR. ALULI: Sure.
> MR. PHELPS: Yes.
> THE COURT: I'm going to clear the courtroom, either that or go back to Chambers, because I don't want this to be -- I don't want the juror to feel uncomfortable. Okay? All right.

After the court excused the rest of the jurors for the day, the court asked Juror 11 to remain:

> [THE COURT:] [Juror 11], I'm going to ask you to remain. All right.
> Everyone else is excused. We'll see you tomorrow morning.
> In fact you can come sit up here [Juror 11], at the witness -- yeah, can you come sit over here. The Court's going to clear the courtroom.
> Everyone here who is not a party, please step outside.
>         (Outside the hearing of the jury.)
> THE COURT: Be seated, Mr. Nakayama.
> Let the record that the Court has excused the panel. Based on the earlier Bench conference, the Court has asked [Juror 11] to remain for perhaps further voir dire on him. He had raised an issue or concern with the bailiff during our last break.
> No one had anticipated or, I think, had maybe considered that Ms. Dunnam is a former employee of the Maui

> Electric Company, both on Maui as well as on Molokai. We all learned during voir dire that [Juror 11] himself was also a retired employee, supervisor, with the Maui Electric Company. And he had revealed that in knowing some of the parties whose names were read. I guess Ms. Dunnam's name did not ring a bell to him. Perhaps she was there for a brief time, but that he thought he may have recognized her, but did not know her. But the other thing I think he mentioned was that he might have been aware of the incident that was spoken about regarding, perhaps, her -- or the blackout that occurred on Molokai.
>
> So the Court has simply asked [Juror 11] to remain so that if the -- the attorneys would like to ask any further questions, you may do so at this time. Is anyone seeking further clarification or any questions for [Juror 11]?

Thereafter, Juror 11 testified that he retired from Maui Electric Company in November 2006. Juror 11 confirmed that at the outset, during jury selection, he did not recognize Dunnam's name when it was read as a potential witness. Referencing the 2008 blackout and Dunnam's resulting termination, Juror 11 described his association with Dunnam as follows:

> Well, I'm not sure that I recall the specific incident that she's talking about. What I can say is that after seeing and hearing her on the stand, I realized that I -- I wouldn't even say I know her, but I know of her because I was employed by Maui Electric Company.

Juror 11 further elaborated that "any contact I've had with her would have been minimal." Despite this, the reason why Juror 11 brought the issue to the court's attention was because:

> [Dunnam] claimed - - the witness claimed - - said that she was working in the Molokai power plant in 2006. Now, I'm not sure what the - what the month is, or - - **I was there at the time**, but I retired from Maui Electric Company in 2006, November 1st, 2006. So . . . I want to make sure that, you know, the Court is aware of that. And **what she had mentioned in testimony lead me to have some -- some questions** that, **based on my experience with Maui Electric, and being the manager of power supply there, her claim that she didn't do anything wrong, it wasn't her fault, when investigation showed that likely her action or inaction was cause of the problem** [sic]. **So based on that**, I want to let the Court know that, well, **her testimony may impact my decision on her credibility**.

After defense counsel's multiple attempts to further question the juror about whether his personal experience and

knowledge caused him to question the witness's credibility were rebuffed by the court, Juror 11 indicated that he would do his best to be as impartial as he possibly could, as he stated during jury selection. When asked again about how he would carry out his juror duties "based upon what [he] heard today," Juror 11 responded that "all I said was that knowing what I know may impact the credibility of the witness." Upon further questioning by the judge, Juror 11 informed the court that he felt he could be a fair and impartial juror.

Following the voir dire of Juror 11, the court denied Aluli's request to remove Juror 11 for cause by reasoning that Juror 11 did not appear to work with Dunnam and that Juror 11 appears to qualify under the standard of being capable of serving as a "fair and impartial juror."

Immediately after the trial court's ruling, the defense objected to the trial court's holding a private hearing to privately voir dire Juror 11:

> MR. ALULI: Your Honor, I want to object to the Court clearing the courtroom to have this proceeding. It's a public trial. I don't see any basis for excluding --
> THE COURT: Okay. You didn't object to that when I asked at the Bench.
> MR. ALULI: Your Honor --
> THE COURT: No. I said I would being clearing, because it was a juror, and you agreed, Mr. Aluli. And now you --
> MR. ALULI: No. I did not object to it, I didn't object to it then.
> THE COURT: I asked if that would be okay, or else we would go in my Chambers. I would have reviewed the juror in my Chambers, then.
> MR. ALULI: Okay. Well, then, frankly, Judge, if it's -- it's clear that you wanted it private. Right?
> THE COURT: For the sake of the juror, correct.
> MR. ALULI: Well, I just object on grounds that this is a open trial and I object on behalf of my client to that proceeding. Simply that, Judge.
> . . . .
> THE COURT: I thought I made it clear at the Bench, by the way, when I asked, that I would be clearing the courtroom for the sake of the juror. I asked if there was

13

any objection to that.  Now, the fact that you remained silent indicates a waiver, Mr. Aluli. You are now saying you did not -- you're now objecting to that.  I would have gladly done this in Chambers or somewhere else.  So I'm advising you that in the future if you do not object, then I'm indicating that as a waiver.

MR. ALULI:  Well, I mean, if -- to me, it's an ineffective waiver if you're gonna put it in Chambers. So the record speaks for itself.  You did not have the family or the public have -- participated in hearing this query with the jury.  I'm objecting under Federal and Constitutional right.

THE COURT:  It was a juror.

MR. ALULI:  A juror.

THE COURT:  Who brought an item to the Court.  That's right.  And I did not want that to be public knowledge.

MR. ALULI:  All right.

THE COURT:  And I would have excluded, most importantly, the press from hearing that.

3.    Officer Roarty's Police Report

During Complainant's testimony, the defense attempted to admit Officer Roarty's entire police report into evidence, to which the State objected.  According to the court, "there are three pages to this report.  The first two give background information, which is not relevant in this case, but the third page refers to a statement that [Complainant has] been testifying to."   The defense argued that the report was being submitted into evidence "for the jury to weigh . . . what [Complainant] said happened on August 18th."  The court allowed the defense to enter only the third page of the report.

Later, during Officer Roarty's testimony, the defense again attempted to enter the remainder of the police report into evidence.  According to defense counsel, the report was being offered to show the classification of the alleged offense (harassment) as originally lodged.  Defense counsel also argued that "[p]age 1 and 2 are relevant [because] it comes in as a complete report by this officer as a complete prior inconsistent statement."  The court again denied admission of the remainder of

the report because "none of that contains her statement," referring to the first two pages of the report.

### 4. Brother's Alleged Prior Bad Acts

During cross-examination of Brother, defense counsel attempted to introduce evidence of Brother's alleged prior bad acts, which included allegations of abuse of family member and the issuance of temporary restraining orders. The following exchange took place:

>          THE COURT: Okay. So tell me what you're offering this under, under 404(b)?
>          MR. ALULI: I'm offering it under, actually, two. 404(b) --
>          THE COURT: 404(b).
>          MR. ALULI: 404(b). And it has to do with -- with, basically, I believe he has a motive and the motive to help his sister, right. And it's also under 405(b) --
>          THE COURT: Wait, wait. You want to show his violence as his proof of a motive?
>          MR. ALULI: I want to show his violence.
>          THE COURT: (Inaudible.)
>          MR. ALULI: Yeah.
>          THE COURT: You think his violence, what you're characterizing as violence, is a pertinent trait?
>          MR. ALULI: Is a pertinent trait of [Brother].
>          THE COURT: Of [Brother]. To show what?
>          MR. ALULI: To show that he was --
>          THE COURT: That he acted in conformity --
>          MR. ALULI: He acted in conformity of being aggressive and belligerent and threatening on August the 18th, which ended up with statements my client made.
>          And that's coupled with --
>          THE COURT: How do you intend to -- I know what you're trying to do. You're trying to show support for that theory. My question to you is -- and, again, I think this is premature -- if you're analogizing this to initial aggressor or something like that. Is that what you're trying it to analogize this to?
>          MR. ALULI: I'm not -- I don't think the same --
>          THE COURT: Or propensity for violence.
>          MR. ALULI: I don't think it should be analyzed like aggressive, like self-defense. I'm not raising it under that theory, Your Honor. Although -- but although by -- by analogy, under the way the courts have looked at it, it's similar. Okay. Although I'm not raising a self-defense, I am raising that it is the context of [Brother's] character, character for aggressiveness. This is not a self-defense, but my defense is pertinent that --
>          THE COURT: What is the relevance of his character for violence? I guess what I'm trying to narrow down.
>          MR. ALULI: That he has character that resulted in my client's case. And he may -- you know, I want him to admit or prove up that he's been aggressive when he's angry, he's been belligerent, threatening when he's angry, and that I

> want to show that it is corroborative of what occurred on
> August the 18th.

The court then denied the defense's request to admit evidence of Brother's alleged prior bad acts.

### 5. Evidence of Apology and Offer to Pay $100

Finally, several of the State's witnesses testified that Nakayama apologized to Complainant. Complainant testified that after Nakayama ejaculated in her car, Nakayama started wiping himself and said, "[s]orry, sorry, sorry, couldn't help myself." Lopez testified that she overheard Nakayama apologize to Complainant while they were at the youth center. Pires testified that he heard Nakayama say "I'm sorry" to Brother and Complainant. Brother testified that, on the day of the incident, when Brother met up with Nakayama, Nakayama jumped out of his truck, grabbed and hugged Brother, and said that he was sorry. Brother also testified that, a few days after the incident, Nakayama called Brother and offered to give Brother one hundred dollars to have Complainant's car cleaned by a local cleaner.

After the State rested, the defense moved the Circuit Court to strike the testimony regarding the apologies as well as Nakayama's alleged offer to pay one hundred dollars, pursuant to HRE Rule 408. In denying the motion, the court stated:

> I don't believe this section applies to what you're arguing in this case. The testimony from [Brother] is that the defendant offered to pay that the day after this alleged meeting took place. I mean, that's the state of the evidence, is that after this -- what [Brother] was attempting was to resolve this matter between two families, that there be no further, I guess, bad feelings or residual feelings. That's according to his testimony. And that it was Mr. Nakayama who called him the next day to say he wanted to offer money for the purpose of cleaning the vehicle, not for the purpose of settling any sort of case. The apology that you allude to also was testified to. So far, the evidence is that it was Mr. Nakayama who agreed to

16

apologize, for the same reason, to resolve this matter between two families. Not to resolve the legal or the criminal case, because that's a decision that only the police and the prosecution can make. It was not within [Brother's], or even [Complainant's], authority to resolve this case on behalf of the State of Hawaii. They could resolve this case on a personal level between families, which -- which is always a good thing. But the case that's before the Court now is a criminal case filed by the Police Department and, eventually, by the Prosecutor's Office. So this is not a situation where an offer of compromise from the Prosecutor's Office was made to [Brother] -- excuse me -- to Mr. Nakayama and, somehow, that has found its way into this trial. Because, of course, the Court would preclude that.

So for those reasons, the Court denies [the defense's] request [to strike].

The defense then moved for judgment of acquittal, pursuant to Hawai'i Rules of Penal Procedure (**HRPP**) Rule 29, incorporating its earlier motion to strike. The Circuit Court also denied the motion for judgment of acquittal.

On March 17, 2011, the jury returned a verdict of guilty for each count charged. The Circuit Court entered its Judgment of Conviction and Probation Sentence on June 2, 2011.

II. POINTS OF ERROR

Nakayama raises eight points of error on appeal:

(1) The trial court plainly erred by *sua sponte* closing the courtroom proceedings to all members of the public during voir dire of a sitting juror who raised an issue during Nakayama's case-in-chief;

(2) The trial court reversibly erred by denying Nakayama's motion to excuse a sitting juror and replacing him with an alternate juror;

(3) The trial court reversibly erred by excusing, over Nakayama's objection, a prospective juror simply because she had a positive experience with defense counsel's prior legal representation;

17

(4)　The trial court reversibly erred by overruling Nakayama's challenges to two prospective jurors for cause during voir dire;

(5)　The trial court reversibly erred by excluding a complete police report because it was relevant and admissible as his complete report and provided the context of the Complainant's inconsistent statement;

(6)　The trial court reversibly erred by limiting Nakayama's cross-examination of prosecution witness, Brother, regarding evidence of his multiple, prior bad acts;

(7)　The trial court reversibly erred by denying Nakayama's motion to strike evidence relating to Nakayama's offers to compromise and/or mediate under HRS 408; and

(8)　The trial court reversibly erred by precluding three defense witnesses from testifying.

III. APPLICABLE STANDARDS OF REVIEW

The appellate court "will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights." State v. Nichols, 111 Hawaiʻi 327, 334, 141 P.3d 974, 981 (2006) (citation omitted).  An appellate court's "power to deal with plain error is one to be exercised sparingly and with caution because the plain error rule represents a departure from a presupposition of the adversary system--that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes." Nichols,

111 Hawai'i at 335, 141 P.3d at 982 (citation omitted).

"We answer questions of constitutional law by exercising our own independent judgment based on the facts of the case." State v. Ortiz, 91 Hawai'i 181, 188, 981 P.2d 1127, 1134 (1999) (citations and internal quotation marks omitted).

In Hawai'i, the appellate courts "review the trial court's decision to pass a juror for cause under the abuse of discretion standard." State v. Kauhi, 86 Hawai'i 195, 197, 948 P.2d 1036, 1038 (1997) (citation and internal quotation marks omitted).

> The admissibility of evidence requires different standards of review depending on the particular rule of evidence at issue. When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard. However, the traditional abuse of discretion standard should be applied in the case of those rules of evidence that require a judgment call on the part of the trial court.
> "Prior bad act" evidence under [HRE] Rule 404(b) (1993) is admissible when it is 1) relevant and 2) more probative than prejudicial. A trial court's determination that evidence is "relevant" within the meaning of HRE Rule 401 (1993) is reviewed under the right/wrong standard of review. However, a trial court's balancing of the probative value of prior bad act evidence against the prejudicial effect of such evidence under HRE Rule 403 (1993) is reviewed for abuse of discretion. An abuse of discretion occurs when the court clearly exceeds the bounds of reason or disregards rules or principles of law to the substantial detriment of a party litigant.

State v. Cordeiro, 99 Hawai'i 390, 403-04, 56 P.3d 692, 705-06 (2002) (citations and some internal quotation marks omitted; format altered).

IV.   DISCUSSION

A.    The Closed Further Voir Dire of Juror 11

Nakayama argues that the Circuit Court plainly erred by sua sponte closing the courtroom to members of the public during the further voir dire of Juror 11, which took place during a

recess during Dunnam's testimony. Nakayama appears to contend that (1) the closure violated his due process rights under the Sixth and Fourteenth Amendments of the U.S. Constitution, and (2) he did not voluntarily waive his right to a public trial.

The Hawai'i Supreme Court has explained:

> The Sixth Amendment provides that in all criminal prosecutions, the defendants shall have the right to a speedy and public trial. Article I, Section 14, of the Hawaii Constitution, which was modeled after the Sixth Amendment to the United States Constitution contains a similar mandate. The purpose of the requirement of a public trial was to guarantee that the accused would fairly be dealt with and not unjustly condemned. But so deeply ingrained has been our traditional mistrust for secret trials that the general policy of open trials has become firmly embedded in our system of jurisprudence.

State v. Ortiz, 91 Hawai'i 181, 190, 981 P.2d 1127, 1136 (1999) (citations, internal quotation marks, and brackets omitted). Further, "the United States Supreme Court has observed that, without exception, all courts have held that an accused is, at the very least, entitled to have his friends, relatives and counsel present, no matter with what offense he may be charged." Id. (citation, internal quotation marks, brackets, and emphasis omitted).

However, this right is not absolute:

> The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

Id. at 191, 981 P.2d at 1137 (citations, internal quotation marks, and emphasis omitted). A four-part test has been applied to determine whether the courtroom may be closed over the defendant's objection:

> (1) the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, (2) the closure must be no broader than necessary to protect that interest, (3) the trial court must consider reasonable alternatives to closing the proceeding, and (4) it must make findings adequate to support the closure.

Id. (citation omitted).

Nakayama heavily relies upon the U.S. Supreme Court's holding in Presley v. Georgia for the proposition that a defendant's right to a public trial is violated where the trial court excluded the public from voir dire of prospective jurors. 558 U.S. 209 (2010). Presley is distinguishable. In Presley, the public was excluded from the entirety of the voir dire process because there was limited space in the courtroom. Id. at 212, 214-16.

Here, the Circuit Court, rather than either party, raised the issue of closing the hearing because it did not "want the juror to feel uncomfortable." Neither party voiced any objection until after the further voir dire was completed and the court ruled. Indeed, it appears that the courtroom closure was no broader or longer than necessary for the stated purpose of making Juror 11 comfortable for the limited follow up voir dire on an issue that the juror had raised as a concern. The court considered the alternative of examining the juror in chambers, and neither party offered any other alternative or suggested that the public should remain. Finally, the Circuit Court stated its specific finding that the closure was for the limited purpose of making the juror feel comfortable to respond to questions from counsel on his knowledge and relationship with Dunnam for the time during which they were both working at Maui Electric

Company.  Under these circumstances, we conclude that the Circuit Court did not plainly err by *sua sponte* closing the courtroom for its limited, mid-trial voir dire of a juror, which was conducted on the record in the presence of the defendant and his counsel, who was given the opportunity to question the juror.

B.    Nakayama's Motion to Excuse Juror 11

Nakayama argues that the Circuit Court reversibly erred by denying his motion to excuse Juror 11 for cause, contending:

> The trial court reversibly erred in failing to excuse [Juror 11] for cause.  Given his admission that defense witness Dunnam's testimony "may impact" his decision on her credibility, the trial court abused its discretion by denying defense counsel's motion to excuse [Juror 11].

Generally, the trial court's exercise of its discretion to excuse or retain a prospective juror is governed by HRS § 612-7 (Supp. 2013), which states:  "A prospective juror shall not be excused by a court for slight or trivial cause, but only when it appears that jury duty would entail a serious personal hardship, or that for other good cause the prospective juror should be excused either temporarily or otherwise."  Here, Nakayama argues that good cause exists because Juror 11 indicated that his experience and knowledge gained at Maui Electric might impact his opinion about the credibility of Dunnam, the defense's only witness, who was called principally for the purpose of raising doubt about Complainant's credibility and the credibility of Pires, a fellow Maui Electric supervisor that Juror 11 worked with "more closely" than another potential witness.  Notably, Pires had been Dunnam's supervisor at Maui Electric, and Dunnam testified that Pires (not Dunnam) had been responsible for the power outage that led to her being fired.

22

Although not set forth in its entirety above, the transcript of Juror 11's further voir dire reveals that the juror, who (like Pires) had been in a supervisory role at Maui Electric, had extra-judicial information that impacted his view of Dunnam's testimony about her role in the blackout, and thus her credibility. Juror 11 noted that Dunnam said it was not her fault, but the "investigation showed that likely her action or inaction was [the] cause of the problem." Nakayama's attorney, Aluli, tried several times to ask whether the juror's prior knowledge and experience at Maui Electric caused him to question Dunnam's credibility. The court did not allow that inquiry, but acknowledged that the juror was the one who had first raised the concern that his knowledge might cause him to doubt Dunnam's credibility. Aluli did ask Juror 11: "Just because the nature of where you retired from, and knowledge as a supervisor about how workers are supervised, how complaints are investigated and all of that, it appears that you have such a superior ability, outside the court, to weigh the credibility of one witness. Is that fair?" Juror 11 answered "yes" and also agreed that the other jurors did not have that context. After confirming that he had out-of-court knowledge about Maui Electric's grievance process, how investigations are put together, and "all the levels that an employee can take," Juror 11 agreed with Aluli that the information he possessed was the reason he came forward to the Court with the concern, stating: "That's correct. But I might add that it was not my intent to share that with -- with other witnesses, you know. All I'm -- all I said was that knowing what

I know may impact the credibility of the witness." Presumably, he meant that it was not his intent to share that information *with other jurors.*

Clearly the Circuit Court had some concerns about Juror 11's extra-judicial personal knowledge about issues testified to at trial because the court instructed the juror: "In addition, I'm going to ask that you not share with your fellow jurors any particulars of this incident that's been referred to, this firing, this termination [of Dunnam]. I'm not asking you not to use your life experiences, but I'm saying anything you might recall about this particular incident, either Ms. Dunnam, her reference to the grievance or whatever, the firing, that you not share those with the jury as well."

The Hawai'i Supreme Court has held, citing the U.S. Supreme Court, that "the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial [] jurors." State v. Graham, 70 Haw. 627, 633, 780 P.2d 1103, 1107 (1989) (citation and internal quotation marks omitted). The court explained:

> When a juror is challenged on grounds that he has formed an opinion and cannot be impartial, the test is whether the nature and strength of the opinion are such as in law necessarily raise the presumption of partiality. The question is one of mixed law and fact . . . . Furthermore, the reviewing court is bound by the proposition that findings of impartiality should be set aside only where prejudice is manifest.

Id. at 633-34, 780 P.2d at 1107 (citations and internal quotation marks omitted). In addition, the supreme court has held:

> Once there is a claim that an accused is being denied his or her right to a fair trial because of outside influences infecting a jury, the initial step for the court to take is to determine whether the nature of the outside influences rises to the level of being substantially

> prejudicial. If it does not rise to such a level, the trial court is under no duty to interrogate the jury. And whether it does rise to the level of substantial prejudice is ordinarily a question committed to the trial court's discretion. Where the trial court does determine that such influence is of a nature which could substantially prejudice the defendant's right to a fair trial, a rebuttable presumption of prejudice is raised. The trial judge is then duty bound to further investigate the totality of circumstances surrounding the outside influence to determine its impact on jury impartiality. The standard to be applied in overcoming such a presumption is that the outside influence on the jury must be proven harmless beyond a reasonable doubt. The trial court, in its investigation of the totality of circumstances, should include individual examination of potentially tainted jurors, outside the presence of the other jurors, to determine the influence, if any, of the extraneous matters.

State v. Samonte, 83 Hawai'i 507, 523-24, 928 P.2d 1, 17-18 (1996) (quoting State v. Williamson, 72 Haw. 97, 102, 807 P.2d 593, 596 (1991)); see also State v. Okumura, 78 Hawai'i 383, 393-94, 894 P.2d 80, 90-91 (1995).

Here, notwithstanding Juror 11's statement that he could still be "fair and impartial," he was clearly signaling to the court that, based on his specific extra-judicial knowledge from his job at Maui Electric Company, he did not believe the testimony of the defendant's only witness, such that it might impact his assessment of her credibility. While the juror was, understandably, not willing to say that he could not be fair and impartial, under the circumstances of this case, that averment is not sufficient. See Kauhi, 86 Hawai'i at 199, 948 P.2d at 1040 (stating that the trial court is "not bound by a [] juror's statement that he or she will be fair and impartial" (citation omitted)). The nature and strength of Juror 11's opinion, which was based on his thirty-year career with the electric company, raised a presumption of partiality that impinged on Nakayama's right to a fair and impartial jury. It is not enough to tell a

25

juror to keep information to himself or herself and to not share it with other jurors. The trial court's assessment that this juror had personal knowledge and information that needed to be withheld from his fellow jurors was indicative that the nature and strength of Juror 11's opinion was much more substantive and significant than something a juror might have been exposed to in, for example, media accounts of an incident. Cf. Graham, 70 Haw. at 634, 780 P.2d at 1108.

In addition, we conclude that the prejudice to Nakayama was manifest. Dunnam was the defense's only witness, her testimony was provided for the sole purpose of discrediting that of Complainant and Pires, and Juror 11 worked "closely" with Pires because they were both supervisors at Maui Electric Company. After the Circuit Court ruled that Juror 11 would not be excused for cause, the State brought Pires back on rebuttal to further attack Dunnam's credibility by testifying that the 2008 island-wide blackout was Dunnam's fault because she did not follow standard operating procedures, the very subject of Juror 11's extra-judicial knowledge that he brought to the court's attention as a concern. Accordingly, the Circuit Court abused its discretion in denying Nakayama's motion to excuse Juror 11 and failing to replace him with an alternate juror.

C. Aluli's Prior Representation of Juror 4

Nakayama maintains that the Circuit Court reversibly erred by dismissing Juror 4 for cause because of her recent prior legal representation by Aluli. Although Juror 4 responded in the affirmative to Aluli's questions of whether she could give the

government a fair trial in this case, or whether she could put her positive experience with him aside and be fair and unbiased, she nonetheless answered in the affirmative when the court asked her, "[do y]ou think you might favor Mr. Aluli more because you had a positive experience with him?" As noted above, the Circuit Court is "not bound by [Juror 4's] statement that [] she will be fair and impartial." See Kauhi, 86 Hawaiʻi at 199, 948 P.2d at 1040 (citation omitted). Therefore, having stated that she might favor defense counsel, showing her apparent bias for the defense, the Circuit Court did not abuse its discretion by excusing Juror 4. See id. ("[i]f the revealed details of the relationship are such that bias or prejudice may be reasonably implied, a juror may be properly refused for cause" (citation and internal quotation marks omitted)).

D.  Nakayama's Motion to Remove Jurors 63 and 21 for Cause

Nakayama maintains that the Circuit Court reversibly erred by failing to excuse Jurors 63 and 21 "given their honest answers that they could not be fair and impartial. The trial court's *sua sponte* questioning of them, which focused entirely on one principle of law -- the presumption of innocence -- constituted an abuse of discretion."

During voir dire, defense counsel informed Juror 63 that the "allegation is going to be made that [Nakayama] masturbated and ejaculated in the complainant's car." Juror 63 expressed her view that any sexual act "hangs in your mind for your whole life", but stated that she "probably can be pretty fair about . . . hearing the information and making a decision,"

27

and that she was "very good at following instructions." Further, she assured the court that Nakayama was presumed innocent until proven guilty and that she would not hold it against him for not testifying.

Similarly, Juror 21 assured the court and defense counsel that she would not hold it against Nakayama should he choose not to testify during trial, that she accepted the principle that Nakayama was presumed to be innocent until proven guilty, and also that the burden of establishing such guilt was on the State. Therefore, although she initially stated that she did not feel that she could be fair, it was because she felt that her childhood experience of seeing someone masturbating in a car might taint her view, depending on the evidence presented. However, when placed within the overriding principles reiterated by the Circuit Court, Juror 21 accepted those principles and stated that she could uphold them in her role as juror. Finally, unlike Juror 11, other than their own initial claims of having preconceived notions about a case of this nature, Jurors 63 and 21 did not demonstrate any link to the parties or personal knowledge of the evidence to be presented such that a presumption of impartiality would arise.

Accordingly, we conclude that the Circuit Court did not abuse its discretion in denying Nakayama's motion to remove Jurors 63 and 21 for cause.

E.    The Police Report

Nakayama argues that Officer Roarty's entire police report should have been admitted into evidence, rather than

28

merely the last page of the three-page report, pointing to HRE Rules 402, 401, and 803(b)(8).

HRE Rule 402 (1993) provides:

> All relevant evidence is admissible, except as otherwise provided by the Constitutions of the United States and the State of Hawaii, by statute, by these rules, or by other rules adopted by the supreme court.  Evidence which is not relevant is not admissible.

HRE Rule 401 (1993) provides:

> 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Finally, HRE Rule 803(b)(8) (Supp. 2013) (emphasis added) provides:

> Public records and reports.  Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (c) in civil proceedings and against the government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

The Circuit Court admitted the third page of the police report as a prior inconsistent statement of the Complainant, in accordance with HRE Rule 613(b); however, the court declined to admit the first two pages because they did not contain any statements by the Complainant.  In citing the hearsay exception in HRE Rule 803(b)(8), Nakayama omits the above underlined portion of HRE Rule 803(b)(8).  The omitted section states that, while government reports are generally allowed as a hearsay exception, "matters observed by police officers and other law enforcement personnel" in criminal cases are excluded from the general hearsay exception.  HRE Rule 803(b)(8).  We conclude that

the Circuit Court did not err in omitting the first two pages of the police report, and only admitting page 3, which was relevant as a prior inconsistent statement. See State v. Espiritu, 117 Hawai'i 127, 136, 176 P.3d 885, 894 (2008) (holding that a "police report is not an exception to hearsay as a public record or report under HRE Rule 803(b)(8)").

F.      Cross-Examination of Complainant's Brother

Nakayama maintains that the Circuit Court reversibly erred in limiting Nakayama's cross-examination of Brother regarding alleged prior bad acts, including allegations of abuse of a family member and the issuance of temporary restraining orders. Nakayama apparently wanted to admit Brother's prior bad acts to show that Brother had a motive to help his sister, that violence was a pertinent trait of Brother's, that he acted in conformity with that trait on the date in question, and, although the record is somewhat unclear on this last part, that Brother's violent nature explained why Nakayama apologized to Complainant even though he was (purportedly) not guilty of the alleged offenses.

After a thorough discussion of the evidence of prior bad acts, the court denied the defense's request to admit evidence of Brother's alleged prior bad acts, but permitted defense counsel to directly ask Brother whether he coerced Nakayama into apologizing to Complainant. In denying the request, the court made the following ruling:

> THE COURT: All right. The Court is not going to allow, at this stage, the defense to introduce the prior record of violence. I don't believe it's relevant at this

> stage. If I had to, maybe, at this point, I would find it to be more prejudicial than probative.
>     The issue is not the apology, in its entirety. The issue is the alleged offense on the date of August 18th. That's the (inaudible). The facts of the apology, obviously, are not (inaudible) factors in this case. I realize that's one of the prongs the defense is trying to explain, I guess. However, no foundation has been laid (inaudible). The Court is not going to allow it.

The Circuit Court did not abuse its discretion in ruling that the evidence would be more prejudicial than probative. The court found that only Nakayama could testify that he was coerced to apologize, but if Nakayama chose not to open the door with that defense (or chose to not testify altogether), it would be too late for the court to strike the evidence of Brother's prior bad acts. Nakayama incorrectly contends on appeal that Brother's statement saying, "I know the consequences of being violent," opened the door for admission of this testimony, because Brother had already answered defense counsel's question regarding coercion, as permitted by the court, but his *propensity* for violence was not put into issue. Accord State v. Maddox, 116 Hawai'i 445, 173 P.3d 592 (App. 2007) (holding that trial court did not abuse its discretion in preventing defendant from questioning victim about victim's alleged past acts of violence until evidence raising a factual issue as to whether victim was the first aggressor was introduced). Further, defense counsel admitted that the foundation for this evidence was not properly laid and notice was not given to opposing counsel, as required by HRE Rule 404(b). Thus, the Circuit Court did not err in excluding this evidence.

31

G.    The Apology Evidence

Nakayama maintains that the Circuit Court reversibly erred by denying his motion to strike what he characterizes as evidence of offers to compromise and/or mediate, pursuant to HRE Rule 408 (1993).[5] The Circuit Court did not err when it concluded that Rule 408 was not applicable.

The Hawai'i Supreme Court has held that "HRE Rule 408 applies in criminal proceedings in that related compromises or attempts to compromise civil liability are not admissible in a criminal trial because of the danger that such evidence may be taken as criminal guilt." State v. McCrory, 104 Hawai'i 203, 209, 87 P.3d 275, 281 (2004) (citations, internal quotation marks, and brackets omitted). Nakayama's apology and offer to pay Complainant one hundred dollars do not fall under the purview of HRE Rule 408. Nakayama's statements were not "made in the course of compromise" nor were the statements "made to a party to the proceedings." McCrory, 104 Hawai'i at 209, 87 P.3d at 281 (citation and internal quotation marks omitted). There is no

---

[5]    HRE Rule 408 provides:

**Rule 408 Compromise, offers to compromise, and mediation proceedings.** Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, or (3) mediation or attempts to mediate a claim which was disputed, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations or mediation proceedings is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations or mediation proceedings. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

evidence in the record that a "compromise" was offered or reached as a result of Brother carrying out his self-proclaimed role of being a "mediator." Complainant is not a party to the proceeding, but rather it is the State that is the opposing party. Further, no civil suit was pending at the time the apology or offer were made. See Gano, 92 Hawaiʻi at 169-70, 988 P.2d at 1661-62.

Therefore, the Circuit Court did not err in denying defense counsel's motion to strike the evidence.

H. The Excluded Defense Witnesses

Finally, Nakayama argues on appeal that the Circuit Court reversibly erred, pursuant to HRE Rule 404(a)(1) (Supp. 2013),[6] in excluding three defense witnesses who would have testified that Nakayama had a character trait for being law abiding.

Below, the defense offered the testimonies of the Mikamis and Lahela Aiwoki to establish that Nakayama has character traits of being "honest and truthful and law abiding." The Circuit Court correctly cited State v. Torres for the proposition that evidence as to one's character for honesty and truthfulness may only be admitted once that character has been

---

[6]     HRE Rule 404 provides, in relevant part:

**Rule 404   Character evidence not admissible to prove conduct; exceptions; other crimes.** (a) Character evidence generally. Evidence of a person's character or a trait of a person's character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:
         (1)     Character of accused. Evidence of a pertinent trait of character of an accused offered by an accused, or by the prosecution to rebut the same[.].

attacked, which was not done here because Nakayama did not take the stand in his own defense, and this character trait is not an element of the crime. See 85 Hawai'i 417, 419, 423-24, 945 P.2d 849, 851, 855-56 (App. 1997) (referencing HRE Rule 608(a)(2)).

Nevertheless, the Intermediate Court of Appeals has held that "[t]he defendant's law-abidingness is a character trait pertinent to all crimes" (although the proffered reputation evidence cannot relate to any time after the offense was committed). State v. Rabe, 5 Haw. App. 251, 263, 687 P.2d 554, 562 (1984). Thus, on the remand of this case for a new trial, Nakayama should be permitted to offer evidence of his law-abidingness up to the time of the alleged incident.

V.   CONCLUSION

For these reasons, the Circuit Court's June 2, 2011 Judgment of Conviction and Probation Sentence is vacated and remanded for a new trial.

DATED: Honolulu, Hawai'i, July 31, 2014.

On the briefs:

Hayden Aluli
for Defendant-Appellant

Peter A. Hanano
Deputy Prosecuting Attorney
County of Maui
for Plaintiff-Appellee

Presiding Judge

Associate Judge

Associate Judge